

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00070-CV

_____

IN THE INTEREST OF T.M., A CHILD

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-683039-20

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant E.B. (Mother) appeals the trial court's order terminating her parental rights to her child Thomas.[1]  In six issues, Mother contends the evidence is legally and factually insufficient to support termination under Family Code Section 161.001(b)(1)(D), (E), and (O); the evidence is legally and factually insufficient to support the trial court's best-interest finding; the trial court abused its discretion by not granting her a directed verdict; and the trial court abused its discretion by admitting certain evidence.  We will affirm.

## II. BACKGROUND

### A. Thomas's Removal and Mother's and Thomas's Drug-Test Results Following Removal

Mother and T.M. (Father) are Thomas's parents.  Two months before Thomas was born, Father was sentenced to fifteen years' confinement for aggravated assault with a deadly weapon.[2]

On May 29, 2020, when Thomas was approximately six-months old, the Department of Family and Protective Services (the Department) removed Thomas from Mother and placed him in foster care because of concerns that Mother was

---

[1]We use aliases to refer to the child and his family members.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The trial court terminated Father's parental rights to Thomas in the same order terminating Mother's parental rights.  Father does not appeal.

mistreating him. During the Department's post-removal investigation, Mother spoke with an investigator regarding the allegations that had been made against her, and Mother denied using drugs, denied shoving Thomas's face into a couch, denied striking Thomas, and denied cursing at Thomas.

After interviewing Mother, the Department's investigator requested that Mother submit to a drug test, and Mother complied, allowing a urine specimen and a hair specimen to be collected on June 15, 2020. Mother's urine tested positive for marijuana, and Mother's hair tested positive for cocaine, cocaine metabolites, and marijuana. When Mother was confronted with the test results, Mother denied cocaine use.[3]

The investigator then requested that Thomas be tested for drugs because of concerns that Mother had been using drugs while caring for him, and a specimen of Thomas's hair was collected for testing on June 26, 2020.[4] At trial, the Department offered records from Cook Children's Medical Center that included a copy of those

---

[3]As to marijuana use, the Department's investigator testified that she could not remember whether Mother admitted to using marijuana when confronted with her June 2020 test results. At trial, Mother was asked whether she agreed with the allegations that had been made against her when the Department became involved, and Mother denied "[s]moking marijuana on live" (live being a reference to social media), although she admitted that she did smoke marijuana.

[4]At the time of this drug test, Thomas was living with his great-grandmother (Great-Grandmother). While he had initially been placed in foster care when he was removed in May 2020, by the middle of June 2020, he was placed with Great-Grandmother. In August 2020, Great-Grandmother asked that he be returned to foster care, and Thomas had been back in the same foster home ever since.

results. The results were positive for amphetamines, methamphetamines, cocaine, and cannabinoids. Mother objected to the admission of these records on the grounds of hearsay and lack of proper foundation, and the trial court overruled Mother's objection. Following the admission of those records, Jennifer Fuentes, the permanency specialist who had been assigned to Thomas's case in June 2020, testified that Thomas had tested "positive for amphetamines, methamphetamines, cocaine, carboxy THC, and native THC." Fuentes also testified that Mother did not understand how Thomas could have tested positive, and Mother denied exposing Thomas to any illegal substances.

## B. Mother's Attempts to Complete Her Service Plan, Mother's Mental-Health Issues, and Mother's Failed Drug Tests

Fuentes testified that she developed a service plan for Mother and that she discussed the service plan with Mother. The service plan required that Mother complete individual counseling, a nurturing parenting class, motherhood classes, and a substance-abuse assessment; that she attend two Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings per week; that she obtain a sponsor; that she have a mental-health evaluation; and that she submit to random drug testing. Fuentes then testified that this service plan was made an order of the trial court.[5]

---

[5]In her brief, Mother complains that she did not have proper notice of the service plan with which she was supposed to comply because even though at trial, the trial court took judicial notice of a July 23, 2020 status order that referenced a service plan filed on June 26, 2020, no service plan was filed on June 26, 2020. We disagree. Fuentes testified that she met with Mother and discussed the items on the service plan

4

Mother complied with many, but not all, aspects of the service plan. As to the requirement of individual counseling, Mother attended two or three sessions with one counseling provider in 2020, but because she had missed three other sessions, she was discharged from that provider in December 2020. Mother was then referred to another counseling provider, but she did not initiate that service. Mother stated that she was living in a shelter at the time of the referral and that she was receiving counseling services provided by the shelter. But Mother admitted at trial that she had not completed her individual counseling.

As to the requirements that Mother complete a nurturing parenting class, motherhood classes, and a substance-abuse assessment, the record reflects that

Fuentes had prepared, and Fuentes then testified about the items on that service plan. Mother also testified that a "safety plan" had been put in place, although it is unclear whether she was referring to the plan already in place when Thomas was removed or Fuentes's later service plan. Moreover, Fuentes also testified that the only change to the service plan she created during the course of the case was the requirement that Mother have a support system. Thus, we cannot say that Mother did not have proper notice of the service plan with which she was supposed to comply. *See In re B.L.H.*, No. 14-18-00087-CV, 2018 WL 3385119, at *8 (Tex. App.—Houston [14th Dist.] July 12, 2018, no pet.) (mem. op.) (holding that although service plan was not part of the appellate record, parent knew what was required by the service plan because she admitted to receiving the service plan); *In re A.M.C.*, No. 09-12-00314-CV, 2012 WL 6061031, at *17 (Tex. App.—Beaumont Dec. 6, 2012, no pet.) (mem. op.) ("Although the execution of a new family service plan was disputed, the trial court could believe the caseworker when she stated Father was offered a new family service plan that continued the requirements of the previous plan, that Father was aware of the plan's requirements because they were discussed with Father, and that Father failed to complete the service plan."). Moreover, the record reflects that on July 17, 2020, Mother filed a written objection to a service plan that had been filed by the Department on July 7, 2020. That service plan largely mirrored the service plan that was discussed by Fuentes at trial.

Mother completed the nurturing parenting class, completed the motherhood classes,[6] and completed an initial substance-abuse assessment. But Mother never went for her actual treatment following the initial substance-abuse assessment.

As to the requirement that Mother attend NA/AA meetings and that she obtain a sponsor, Mother testified that she started attending NA/AA meetings in July 2021 and that she attended the meetings every other week. On the first day of trial,[7] Mother testified that she did not have a sponsor, while on the second day of trial, Mother testified that she did have a sponsor.[8] Mother testified that she spoke to her sponsor every other week.

As to the requirement that Mother have a mental-health evaluation, the record reflects that Mother was diagnosed with depression, anxiety, and bipolar disorder and that she had been receiving mental-health treatment since she was ten years old. Mother testified that for the two years prior to trial, she had been prescribed medications to treat her mental-health problems, but she had not taken her medications consistently since Thomas's removal in May 2020. Mother admitted that

---

[6]Fuentes testified that Mother technically did not graduate from the motherhood classes because she did not turn in paperwork, although Fuentes admitted that Mother did complete all of her motherhood classes.

[7]The trial took place over two days separated by two-and-a-half weeks, with the first day of trial taking place on October 14, 2021, and the second day of trial taking place on November 1, 2021.

[8]On the second day of trial, Mother testified that she had been confused on the first day of the trial when she had stated that she did not have a sponsor.

6

she had stopped taking her medications after Thomas was removed because she felt like they were not working and because she was feeling depressed.

Mother testified that she had started taking her medications again in January 2021, although she also stopped taking them again when she became pregnant with another child, Kevin (who was born in September 2021), because her doctor had told her to stop taking her medications while pregnant.[9]  Mother testified that while she had started taking some of her medications again following Kevin's birth, she still did not take one of them because it "put[] [her] to sleep" and because she could not take care of Kevin while on the medication.  Fuentes testified that she visited Mother during the break between the first and second day of trial and asked to see Mother's prescriptions for her medications, but Mother did not show the prescriptions, claiming that "she had her appointment coming up to get her prescriptions."  The record also reflects that Mother sought mental-health treatment at Metrocare at various points in 2019, 2020, and 2021.

As to the requirement that Mother submit to random drug testing, Mother submitted to numerous random drug tests after Thomas's removal, although the record also reflects that in July 2020, the Department was unable to obtain the results

---

[9]There was conflicting evidence regarding whether Kevin tested positive for illegal drugs after his birth.  A Department investigator assigned to Mother and Kevin testified that Kevin "was negative on his UA and negative on meconium per the social worker at the hospital" but that a hospital affidavit requested by the investigator reflected that "the marijuana results for the meconium were presumptively positive."

of a requested drug test because the temperature of the urine submitted by Mother to the testing facility was not within the facility's guidelines.[10] Fuentes also testified that Mother did not complete requested drug testing in October 2020 and July 2021. As to the use of illegal drugs, Mother testified that she had been "drug free" during the duration of the termination case.[11] However, her drug-test results tell a different story.

In October 2020, Mother's hair tested positive for amphetamines and methamphetamines. In November 2020, Mother's hair and urine tested positive for marijuana and cocaine. Fuentes testified that sometime after February 2021, Mother took a drug test "for her attorney," and Mother reported to Fuentes that the test came back positive for methamphetamines. In March 2021, Mother's hair tested positive for cocaine and cocaine metabolites. In June 2021, Mother took a drug test on her own, and she told Fuentes that her urine "was positive due to her using CBD."[12] In August 2021, Mother's hair tested positive for marijuana and marijuana metabolites.

---

[10]Fuentes testified that although she told Mother to stay at the facility and submit another sample, she never received any results from that requested July 2020 drug test. Mother testified that she offered to take another drug test that day but that the facility told her she could not take another drug test that day.

[11]Mother testified that she had used ecstasy before Thomas was born and admitted to smoking marijuana in the past. Mother stated, however, that she had never used methamphetamines and had never used cocaine. Mother admitted that being around methamphetamines and cocaine was not a safe environment for a child.

[12]It is unclear from this testimony what drug caused Mother to test positive on that occasion.

At trial, Mother contended that the positive-test results were "false positives" or were caused by her use of CBD.

Mother's use of illegal drugs and the deleterious effect they have had on her life are reflected in a July 14, 2021 intake screening form that was completed for Mother at Recovery Resource Council. The intake form reflects that Mother had admitted to using alcohol or drugs in the thirty days prior to the July 14, 2021 screening, and it identifies the substance as "Other Synthetic Cannabinoids (K2, Spice)." The form further states that Mother had "tried to cut down on alcohol or drugs and [was] unable to do it"; that she had "gotten so high or sick from alcohol or drugs that it . . . [k]ept [her] from doing work, going to school, or caring for children" and had "[c]aused an accident or bec[o]me a danger to [Mother] or others"; and that Mother's use of "alcohol or drugs caused . . . [p]roblems with family, friends, work, or [the] police." The Recovery Resource Council records also reflect that Mother admitted to using marijuana in February 2020, a few months prior to Thomas's removal.

## C. Mother's Claimed Life of Stability in the Months Before Trial and Department Visits to Mother's Residence Near the Time of Trial

Mother testified that she had lived in seven places since Thomas's November 2019 birth: (1) a Union Gospel Mission shelter; (2) a friend's house; (3) Budget Suites; (4) Great-Grandmother's house; (5) a SafeHaven shelter; (6) a Salvation Army shelter; and (7) a Dallas apartment. Mother testified, however, that she had found stability in

her life, saying that she had been stable in the seven months prior to trial after meeting her boyfriend.[13]

Mother testified that she, her boyfriend, and Kevin had been living in the Dallas apartment for the two months prior to trial. Mother stated that both her name and her boyfriend's name were on the lease, and that they had both paid rent. However, the record also reflects that Mother had initially planned on giving Kevin up for adoption and that the adoption agency had helped pay Mother for the apartment's rent.[14] As to Mother's financial stability, Fuentes testified that Mother had seven different jobs during the pendency of the Department's case, although Fuentes only received pay stubs to verify two of the jobs. Mother testified that she had also been receiving Social Security Income (SSI) due to her mental-health issues.

Mother also testified that she had pending criminal charges at the time of trial—charges for aggravated assault with a deadly weapon and criminal mischief— and that she did not have a plan in place for Thomas if she was convicted. The record further reflects that Mother had been involved in three car accidents during the Department's case, that she had been driving without a license during two[15] of the car

---

[13]Mother's boyfriend had moved to Texas in the four years preceding trial, and he had a criminal history as a juvenile in Louisiana.

[14]Fuentes testified that her understanding was that the adoption agency had paid the "down payment as well as first month's rent to get in the apartment."

[15]Mother was not driving during the third car accident.

accidents, that she still did not have a driver's license at the time of trial, and that she drove herself to trial even though she did not have a license.

At trial, Amy Romero, a Department investigator who had been tasked with investigating Mother and Kevin, testified that she had stopped by twice at the Dallas apartment to check in on Mother and Kevin. Romero testified that Mother's boyfriend was present on both occasions and that the visits went well. Romero stated that the residence was appropriate, that Kevin was clean, dressed well, and being appropriately fed, and that she did not have any concerns after visiting the apartment.

In between the first day of trial and the second day of trial,[16] Fuentes also went to the Dallas apartment to check in on Mother, and Fuentes brought Thomas with her. Fuentes testified that the apartment was appropriate and that Mother was appropriate with Thomas and Kevin. Fuentes noted that the apartment contained a room for Thomas, although she expressed a concern that the bed in that room might need side rails and that the toys and clothes in the room were more appropriate for an older child. While Fuentes maintained that she did not have concerns with Mother's parenting during that visit, the Department had ongoing concerns with Mother's illegal drug use, mental-health issues, and housing.

---

[16]As noted above, the first day of trial took place on October 14, 2021, and the second day took place on November 1, 2021.

11

**D. Procedural Background**

In its petition and at trial, the Department sought termination of Mother's parental rights based on the predicate termination grounds set forth in, among other subsections, Subsections (D), (E), and (O) of Section 161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

At the conclusion of the Department's presentation of its case, Mother moved for a directed verdict, arguing that the Department had not proven by clear and convincing evidence any of the predicate grounds for termination nor had it proven that termination was in Thomas's best interest. The trial court denied Mother's request for a directed verdict. Mother later proceeded with her own case at trial, but she did not re-urge her motion for directed verdict at the conclusion of her case.

Following trial, the trial court issued a ruling finding that Mother had engaged in conduct under Subsections (D), (E), and (O) of Family Code Section 161.001(b)(1) and finding that termination was in Thomas's best interest. Mother appeals from that termination order.

## III. DISCUSSION

### A. The Admission of Thomas's Drug-Test Results

In her sixth issue, Mother argues that the trial court abused its discretion by admitting the Cook Children's medical records that contained a copy of Thomas's June 2020 drug-test results and by allowing Fuentes to testify regarding the results.

12

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). But any preserved error in admitting evidence is deemed harmless and is waived if the objecting party later permits the same or similar evidence to be introduced without objection. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235–36 (Tex. 2007); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004).

At trial, Mother objected to the admission of the Cook Children's medical records that contained a copy of Thomas's June 2020 drug-test results on the grounds that they contained hearsay and lacked proper foundation, and the trial court overruled Mother's objection. However, Mother did not object when Fuentes testified that Thomas had tested "positive for amphetamines, methamphetamines, cocaine, carboxy THC, and native THC." Because Mother did not object to Fuentes's testimony during trial, she has not preserved her complaint regarding Fuentes's testimony on appeal. *See Bushell*, 803 S.W.2d at 712.

And assuming without deciding that the trial court abused its discretion by admitting the copy of Thomas's drug-test results contained in the Cook Children's medical records, any error in its admission was harmless because Fuentes's testimony—which was substantially similar to the information contained in the copy

13

of Thomas's drug-test results—was heard by the trial court without objection. *See In re D.R.*, 631 S.W.3d 826, 831 (Tex. App.—Texarkana 2021, no pet.) ("[A]ny error in admitting drug[-]test results was rendered harmless by substantially similar testimony admitted without objection."); *In re T.R.L.*, No. 10-14-00290-CV, 2015 WL 1020865, at *8 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) ("Although K.L. and J.R.L. objected to the admission of the exhibits, they permitted the relevant substance of the exhibits (i.e., results of the drug tests) to be admitted without objection. We therefore hold that even if the trial court erred by admitting the exhibits, such error was rendered harmless."); *D.O.H. v. Tex. Dep't of Fam. & Protective Servs.*, No. 14-10-00725-CV, 2011 WL 3684568, at *3 (Tex. App.—Houston [14th Dist.] Aug. 23, 2011, no pet.) (mem. op.) (holding that any error in determining that drug-test results were admissible was rendered harmless by similar testimony that came in without objection that parent used cocaine during relevant period). We overrule Mother's sixth issue.

## B.  Conduct Grounds

In her second through fourth issues, Mother argues that the evidence was insufficient to support termination under Family Code Section 161.001(b)(1)(D), (E), and (O).

### 1.  Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and

14

(2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re*

15

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the conduct grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 2. The Law

Subsections (D) and (E) of Family Code Section 161.001(b)(1) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that a parent has

(D)  knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

(E)  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection 161.001(b)(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in

the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* As an example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* Illegal drug use by the parent and drug-related criminal activity by the parent "likewise support[] the conclusion that the child[]'s surroundings endanger [his] physical or emotional well-being." *Id.*

Under Subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Illegal drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct. *Id.*

17

In our review, we may consider conduct that occurred outside the child's presence. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We may also look at parental conduct both before and after the child's birth to determine whether termination is necessary. *R.W.*, 129 S.W.3d at 738; *J.T.G.*, 121 S.W.3d at 125.

### 3. Analysis

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those Subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record reflects that Mother has had persistent problems with illegal drugs. Mother tested positive for cocaine, cocaine metabolites, and marijuana in June 2020, and Thomas tested positive for amphetamines, methamphetamines, cocaine, and cannabinoids in June 2020.[17] Mother's use of illegal drugs continued after Thomas's removal, with the record reflecting for Mother: (1) an October 2020 positive test for amphetamines and methamphetamines; (2) a November 2020

---

[17]In her brief, Mother contends that there is no evidence of endangerment prior to removal, pointing to the fact that removal occurred in late-May 2020 and that she and Thomas were not tested for drugs until June 2020. We disagree. Records from Recovery Resource Council indicate that Mother admitted to using marijuana in February 2020. Moreover, when questioned about the allegations that had been made against her when the Department became involved, Mother admitted to marijuana use.

positive test for marijuana and cocaine; (3) a positive test for methamphetamines taken sometime after February 2021; (4) a March 2021 positive test for cocaine and cocaine metabolites; and (5) an August 2021 positive test for marijuana and marijuana metabolites. While Mother claimed that she had been "drug free" during the duration of the termination case and blamed the positive test results on "false positives" or her use of CBD, the trial court could have chosen not to believe Mother's testimony. *See In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *4 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (holding that trial court "was not required to believe the mother's assertion that the [drug] test produced a false positive").

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Thomas to remain in conditions or surroundings that endangered Thomas's emotional or physical well-being and that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our

own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed Thomas to remain in conditions or surroundings that endangered his emotional or physical well-being and that Mother had engaged in conduct that endangered his physical or emotional well-being.[18] *See id.* We thus overrule Mother's second and third issues.

Because we hold that the evidence is legally and factually sufficient to support the endangerment findings under Section 161.001(b)(1)(D) and (E), and because only one finding is necessary to sustain a parental-rights termination, we need not address Mother's challenge to the trial court's finding under Section 161.001(b)(1)(O). *See* Tex. Fam. Code Ann. § 161.001(b)(1); *E.N.C.*, 384 S.W.3d at 803; *J.L.*, 163 S.W.3d at 84; *see also* Tex. R. App. P. 47.1. We therefore do not address Mother's fourth issue.

## C. Best Interest

In her first issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

---

[18]In her brief, Mother contends that her stability with Kevin in the months before trial demonstrates that she had not engaged in a course of endangering conduct with Thomas. However, "even if a parent makes dramatic improvements before trial, 'evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.'" *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g) (quoting *J.O.A.*, 283 S.W.3d at 346).

20

## 1. Standard of Review and Applicable Law

We review Mother's challenge to the sufficiency of the trial court's best-interest finding under the same review standards stated above regarding the conduct grounds. Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

21

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at \*7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at \*4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

### 2. Best-Interest Analysis

As to Thomas's emotional and physical needs now and in the future and the emotional and physical danger to Thomas now and in the future, the record reflects, as detailed above, that Mother has continued to use illegal drugs during the pendency of this case. In addition, Mother has mental-health concerns and has inconsistently taken her mental-health medications during the pendency of this case. While her decision to stop taking her medications at one point in the case may have been justified due to her pregnancy and the purported advice of her doctor not to take the medications while pregnant, at another point in the case, Mother stopped taking her mental-health medications without justification. Therefore, the evidence shows not only that Mother would continue to have trouble meeting Thomas's needs but also

that she would continue to be an emotional and physical danger to him. Fuentes testified that Thomas's needs were currently being met in the foster home and that she did not have any concerns regarding placement with the foster family. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Thomas.

As to Mother's plans for Thomas and the Department's plans for him, the record reflects that the Department's permanency plan for Thomas would be adoption, while Mother desired that Thomas be returned to her. The record further reflects that Mother had pending criminal charges at the time of trial—charges for aggravated assault with a deadly weapon and criminal mischief—and that Mother did not have a plan in place for Thomas if she was convicted. Mother's plan also included support from her father and mother. Mother's father had recently been in prison, and the Department had excluded him as a potential placement for Thomas due to his criminal history and Child Protective Services (CPS) history. Mother's mother, who was pregnant at the time of trial and had a CPS history of her own, had also been excluded as a potential placement for Thomas. Thus, returning Thomas to Mother could continue to subject him to instability because she did not have any concrete plans for his care. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Thomas.

As to the stability of the home or proposed placement, the record reflects that Mother had lived in seven different places in the two years between Thomas's birth

and the time of trial, including multiple shelters and the homes of a friend and a relative. While Mother claimed stability and had lived in the Dallas apartment for the two months prior to trial, the record reflects that Mother had relied on others to financially support her housing—namely an adoption agency and Mother's boyfriend. Given Mother's inability to obtain consistent employment, the trial court was entitled to find that Mother was unlikely to maintain stable housing after trial. A factfinder may measure a parent's future conduct by her past conduct. *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.—Waco 2015, pet. denied). Thus, the trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Thomas.

As to Mother's acts or omissions that may indicate that the existing parent–child relationship is not a proper one and any excuses for Mother's acts or omissions, the record reflects, as detailed above, that Mother used illegal drugs during this case. While Mother blamed her positive drug-test results on "false positives" and her use of CBD, the trial court could have chosen not to believe Mother's testimony. *See Z.L.W.*, 2013 WL 396270, at *4. And while Mother had some justification for ceasing use of her mental-health medications during some parts of this case, at another part of the case, Mother simply stopped taking her medications because she felt like they were not working. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Thomas.

24

The record also reflects that Mother did not comply with her service plan. At trial, Fuentes testified that Mother's service plan required, among other things, that Mother complete individual counseling, a nurturing parenting class, motherhood classes, and a substance-abuse assessment; that she submit to random drug testing; and that she maintain stable employment and housing. While Mother did attend a nurturing parenting class and motherhood classes, she admittedly did not complete her individual counseling. Moreover, while Mother completed an initial substance-abuse assessment, she never went for her actual treatment following the initial substance-abuse assessment. Mother also did not complete requested drug testing in October 2020 and July 2021, and when she did complete drug testing, her drug-test results were often positive for illegal drugs. Finally, Mother did not maintain stable employment during the case—Fuentes testified that Mother had seven different jobs during the case—and, as noted above, Mother did not maintain stable housing during the case.

The trial court was entitled to find that Mother's noncompliance with the service plan weighed in favor of terminating Mother's parental rights to Thomas. *See In re W.G.*, No. 07-21-00316-CV, 2022 WL 1609442, at *7 (Tex. App.—Amarillo May 20, 2022, no pet. h.) (mem. op.) ("Given the connection between a service plan and the *Holley* and statutory factors, a parent's actions or inactions with regard to the service plan is relevant to a child's best interest."); *In re M.L.H.*, No. 04-21-00408-CV, 2022 WL 526501, at *4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem.

25

op.) (considering the failure to complete service plan as support for finding that termination is in child's best interest).

### 3. Best-Interest Conclusion

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and Thomas was in Thomas's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's first issue.

### D. Mother's Motion for Directed Verdict

In her fifth issue, Mother argues that the trial court erred by denying her motion for directed verdict. "[T]he law is well settled that a defendant who moves for a directed verdict after the plaintiff rests, but thereafter proceeds with her own case, waives her motion for directed verdict unless the motion is re-urged at the close of her case." *Horton v. Horton*, 965 S.W.2d 78, 86 (Tex. App.—Fort Worth 1998, no pet.); *see Meek v. Onstad*, 430 S.W.3d 601, 611 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (similar language); *Majeed v. Hussain*, No. 03-08-00679-CV, 2010 WL 4137472,

26

at *4 (Tex. App.—Austin Oct. 22, 2010, no pet.) (mem. op.) (similar language).  Here, while Mother moved for a directed verdict at the conclusion of the Department's case, she then proceeded with her own case and did not re-urge her motion for directed verdict at the close of her case.  Accordingly, Mother has waived her complaint that the trial court erred by denying her motion for directed verdict.  *See Horton*, 965 S.W.2d at 86.  We overrule Mother's fifth issue.

## IV.  CONCLUSION

Having overruled Mother's dispositive issues, we affirm the trial court's termination order.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  July 7, 2022

27